**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 20-05 (JDB)** |
| **ALPHONSO CARTER,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

Defendant Alphonso Carter was indicted on one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).  Before the Court is Carter's motion to suppress physical evidence that was recovered after he was stopped on the street by police late on New Year's Eve 2019.  For the following reasons, the Court will grant Carter's motion.

## Background

On December 31, 2019, at approximately 11:15 pm, Metropolitan Police Department ("MPD") Officers Aaron Dabney and Robert Kelly, members of MPD's Crime Suppression Team, were patrolling the Sixth District in Washington, D.C.  June 26, 2020 Hearing Transcript ("Tr.") [ECF No. 38] at 7:17–21, 16:17–19.  The Sixth District is considered a high-crime area.  Id. at 9:16–25.  The officers were in full police uniform, driving a marked MPD police vehicle.  Id. at 16:18–24.  Officers Dabney and Kelly received a "ShotSpotter" alert about possible shots fired in the 4900 block of Nash Street NE, near where they were patrolling.[1]  Id. at 13:7–15; see also

---

[1] The "ShotSpotter" system is a "group of sensors" that are set up around the city to "detect the decibel that a gunshot will make."  Tr. at 13:18–19.  When gunshots are fired, the system can triangulate their location so police can more accurately respond.  Id. at 13:20–22.  If a gunshot is detected, the MPD Command Information Center broadcasts an alert to MPD officers to check ShotSpotter.  Id. at 13:25–14:5.  MPD officers have access to ShotSpotter on their work cell phones.  Id. at 14:5–8; see also Gov't's Ex. 8, ShotSpotter Detail Report 4905 Nash St NE ("ShotSpotter Report").

ShotSpotter Report. Officer Dabney, using his police radio, broadcast that he and Officer Kelly were close to Nash Street and would investigate the alert. Tr. at 16:10–16, 17:2–10; see also Gov't's Ex. 6, Google Maps 4700 to 4900 Nash Street. When they arrived in the area, they saw three individuals walking westbound down Nash Street NE away from the sound of the gunshots. Tr. at 18:10–16. Officer Dabney broadcast brief descriptions of these individuals' appearances: one male in a black puffy coat and hat, one male in a white and black coat, and one male in a dark colored jacket. Id. at 18:19–20; see also Gov't's Ex. 7, Audio File of Radio Broadcast. Officer Dabney testified that these three individuals were the only people he saw in the area of the alert. See Tr. at 17:11–14.

The officers, still in their police cruiser, followed the three men and pulled up next to them walking northbound in the 1300 block of 48th Street NE. See Gov't's Ex. 1, Officer Dabney's Body Worn Camera ("Dabney's BWC") at T 04:21:29Z.[2] The cruiser's red-and-blue flashers were on. Id. at T 04:21:34Z. Officer Dabney got out of the cruiser and issued a series of instructions to the men, including to "stop and talk to me real quick, come over to me real quick and then I'll get out of your way," "just come over here I'll get out of your way," "come here," and "walk to the car, man, it's real simple." Id. at T 04:21:33–04:21:44Z. As he was instructing the men to talk to him, Officer Dabney walked to the sidewalk in front of the first man and Officer Kelly walked to the back of the group behind the third man, thereby cornering the suspects between a fence on their right and the police vehicle on their left. See id. at T 04:21:46Z. In response to the first man's protests that they had done nothing wrong, Officer Dabney stated: "I know you're not doing nothing man, but I got to stop you." Id. at T 04:21:51Z.

---

[2] "Z" in the BWC timestamps refers to Zulu time, which is commonly used in aviation and the military, as well as by the MPD, to standardize time stamps. 04:21:00Z corresponds to 11:21:00 pm Eastern Standard Time. See Tr. at 24:15–25, 25:10–14.

Officer Dabney explained to the three men that there had been shots in the area they were walking away from, "right there on Nash." Id. at T 04:22:00Z. He then told them to "lean up against the fence." Id. at T 04:22:02Z. All three men complied. The man in the dark jacket, standing closest to Officer Dabney, told Officer Dabney that the three men had just come from a house and were not doing anything. Id. at T 04:22:15–04:22:35. The man in the black puffy coat, standing closest to Officer Kelly, stated that the officers were conducting an illegal stop and that he would be calling his lawyer. See Def.'s Ex. 1, Officer Kelly's Body Worn Camera ("Kelly's BWC") at T 04:22:15–04:22:45Z.

The man in the middle wearing a white and black varsity style jacket, later identified as defendant Alphonso Carter, was holding a white bag in his right hand. Id. at T 04:21:45–04:22:09Z. He gestured slightly with both arms as the officers ordered him against the fence. See Dabney's BWC at T 04:22:04. Officer Dabney believed that Carter kept his right upper arm pinned to his body during his gesturing, which Officer Dabney considered to be a suspicious indication that Carter was carrying a weapon. See Dabney's BWC at T 04:22:08–04:22:16Z; see also Tr. at 27:6–12. When Officer Dabney asked the suspects if they had heard gunshots, Carter replied that "it is the Fourth of July and there's all type of gun sounds," to which Officer Dabney responded that "it's not Fourth of July, though, but I understand." Dabney's BWC at T 04:22:20Z. As Officer Dabney corrected him, Carter stated "it's New Year's," and Officer Dabney replied "I understand." Id. at T 04:22:25Z. Officer Dabney then told the man in the dark jacket that he needed to pat him down for weapons, to which the man replied "you don't have my consent to search." Id. at T 04:22:41Z. Officer Dabney replied that he did not need consent, as he had "probable cause." Id. at T 04:22:46Z. He asked the man in the black jacket to put his hands on his head. Id. at T 04:22:50Z. Additional officers then arrived on the scene. See Tr. at 28:3–5.

Around that time, Carter took off running between Officers Dabney and Kelly toward the middle of the street.  Dabney's BWC at T 04:22:55Z.  The officers gave chase and, within five seconds, pinned him to the ground, yelling "get the hands, get the hands" and "stop reaching."  Id. at T 04:23:00Z; Kelly's BWC at T 04:23:06.  The officers pinned Carter on his stomach and placed his hands in handcuffs behind his back.  Dabney's BWC at T 04:23:08–04:23:12Z.  When Officer Dabney moved Carter's right arm, he felt a hard metal object in Carter's front right jacket pocket.  Tr. at 29:10–13.  Officer Dabney asked one of the other officers on the scene, Officer Hudson, to "roll him [Carter]" and said "it's right here," referring to the hard metal object he had felt in Carter's pocket.  Dabney's BWC at T 04:23:30–04:23:36Z.  Officer Dabney opened Carter's pocket and stated "I got it, it's a 95," meaning a firearm.  Id. at T 04:23:44Z; see also Tr. at 29:22–30:1.

Carter was indicted on January 6, 2020, by a federal grand jury on one count of Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).  See Indict. [ECF No. 8] at 1–2.  He was released into the High Intensity Supervision Program with Pretrial Services on January 9, 2020, pending trial.  See Order Setting Conditions of Release [ECF No. 11] at 2.  On March 24, 2020, Carter filed the instant motion to suppress physical evidence.  See Mot. to Suppress Evidence Seized from Dec. 31, 2019 Search and Seizure of the Def. ("Def.'s Mot.") [ECF No. 24].  The Court held an evidentiary hearing on the motion and heard oral argument on June 26, 2020.  See June 26, 2020 Minute Entry.  The matter is now fully briefed and ripe for decision.

## Legal Standard

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. amend. IV.  A Fourth Amendment seizure occurs "when physical force is used to restrain movement or when a person submits to an officer's show of authority."  United States v.

4

Brodie, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (internal quotation marks omitted).  An officer may approach a person in public and ask him questions without the encounter rising to the level of a Fourth Amendment seizure.  See Florida v. Royer, 460 U.S. 491, 497 (1983).  Such questioning, however, becomes a Fourth Amendment seizure where "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  Florida v. Bostick, 501 U.S. 429, 437 (1991) (internal quotation marks omitted).  Courts should consider the totality of the circumstances when evaluating whether and when "a reasonable person would have believed that he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).

Some encounters, while amounting to Fourth Amendment seizures, do not require probable cause: officers may "briefly detain a citizen" where they "ha[ve] a reasonable, articulable suspicion that 'criminal activity may be afoot.'"  United States v. Edmonds, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).  To "seize[] a person on less than probable cause," an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity."  United States v. Castle, 825 F.3d 625, 634 (D.C. Cir. 2016) (internal quotation marks omitted).  When making a reasonable suspicion determination, courts are instructed to view the "totality of the circumstances" and not to engage in a "divide-and-conquer analysis" that asks whether each fact is "susceptible to an innocent explanation."  United States v. Arvizu, 534 U.S. 266, 274 (2002).

"When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure."  United States v. Sheffield, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing Wong Sun v. United States, 371 U.S. 471, 484

(1963)).  The party challenging the alleged seizure "bears the burden of demonstrating that he was seized."  Castle, 825 F.3d at 633.  The government bears the "burden to provide evidence sufficient to support reasonable suspicion."  Id. at 634.

## Analysis

Carter argues that any physical evidence recovered as a result of his encounter with the police on December 31, 2019—i.e., the firearm—must be excluded because the officers lacked reasonable suspicion or probable cause to stop him, thereby violating the Fourth Amendment.  Def.'s Mot. at 1–3.  In response, the government argues that the officers did have reasonable suspicion that criminal activity was afoot, even when they first encountered Carter, and that this reasonable suspicion rose to the level of probable cause by the end of the encounter.  Gov't's Opp'n to Def.'s Mot. to Suppress Physical Evidence ("Gov't's Opp'n") [ECF No. 26] at 7.  The Court agrees with Carter and concludes that (1) the officers' initial interaction was a Fourth Amendment seizure, as was the rest of the encounter, and (2) the officers lacked reasonable suspicion to seize him, both at the time of the initial interaction and partway through the encounter.

### A.  Initial Interaction

The initial interaction between Carter and the officers began when the officers pulled up next to the men in a marked police cruiser, got out of the car, and Officer Dabney repeatedly instructed the men to "just come over here, and I'll get out of your way."  See Dabney's BWC at T 04:21:29–04:21:44Z.  The officers almost immediately blocked Carter and his companions alongside a fence, with Officer Dabney standing in front of them and Officer Kelly standing behind them.  Id. at T 04:21:46Z.

i.     **Seizure**

The Court's first task is to pinpoint the time of the seizure.  A seizure occurs when there is (1) a show of authority by the officers and (2) submission to that authority by the defendant. California v. Hodari D., 499 U.S. 621, 626 (1991).  The D.C. Circuit's recent decision in United States v. Delaney, 955 F.3d 1077 (D.C. Cir. 2020), is particularly instructive here, as it involves very similar facts.  In Delaney, two MPD officers were patrolling a "residential area" on New Year's Eve 2017 "in uniform and in a marked police cruiser." Id. at 1079.  Shortly after midnight, the officers heard repeated gunfire, including shots that the officers believed to be close by, and about a minute later the officers came upon the defendant and another individual sitting in a parked car.  Id. at 1079–80.  The officers parked their cruiser in a manner restricting the defendant's movement and approached the car from both sides.  Id. at 1080.  Based on the officers' restriction of the defendant's movement, the time of the encounter, and the use of a spotlight, the D.C. Circuit concluded that there had been a sufficient show of authority, that defendant had submitted to that authority, and thus that a Fourth Amendment seizure had occurred.  Id. at 1085.

Applying the factors considered by the Delaney court, this Court concludes that the officers' conduct here amounted to a "show of authority" that would have communicated to a reasonable person that he was not at liberty to leave.  First, the officers—as in Delaney—blocked Carter's path and prevented him from going about his business by positioning themselves in front of and behind him.  Cf. id. at 1083–84 (concluding that "officers need not totally restrict a citizen's freedom of movement in order to convey the message that walking away is not an option" (quotation omitted)); see United States v. Wood, 981 F.2d 536, 540 (D.C. Cir. 1992) (finding a seizure where "Officer Webb's positioning . . . significantly restricted [defendant's] movements").  Carter was therefore blocked on all four sides: Officer Dabney in front, Officer Kelly behind, a

7

fence on one side and the police cruiser on the other.  See Dabney's BWC at T 04:21:48Z.  This restriction of Carter's movement clearly conveyed to Carter that he was not free to leave.

Furthermore, the incident took place late at night, after 11:20 p.m., which also suggests a show of authority.  See Delaney, 955 F.3d at 1083 ("[W]hen a police encounter occurs at night . . . a reasonable person would feel unfree to ignore the police presence." (internal quotation marks omitted)).  Finally, while Officer Dabney did not turn on the police cruiser's siren or shine a bright light at Carter, he did activate its red-and-blue flashers, further suggesting a show of authority.  See id. at 1083 (considering the fact that the officers "directed their cruiser's take-down light" on the defendant to be an important factor); cf. Michigan v. Chesternut, 486 U.S. 567, 575 (1988) (noting, in concluding that there had not been a show of authority, that "[t]he record does not reflect that the police activated a siren or flashers"); United States v. Goddard, 491 F.3d 457, 461 (D.C. Cir. 2007) (finding that, in contrast to the present case, "police presence does not constitute a seizure where the officers did not use their siren or flashers").

The government argues that Delaney is distinguishable for two reasons: first, because Officer Dabney did not directly impede Carter's movement with his police cruiser, and second, because he did not use his cruiser's bright take-down light.  As for the first argument, while the police cruiser was not the only thing impeding Carter's movements, it was one of several movement-restricting elements: Officers Dabney and Kelly stood in front of and behind Carter, who was also blocked on both sides by the police cruiser and a tall iron fence.  See Dabney's BWC at T 04:21:46Z.  The determinative factor in Delaney was not that the police cruiser itself blocked the defendant's movements, but the aggregate "restrictions on [the defendant's] movement."

Delaney, 955 F.3d at 1083–84 (citing Castle, 825 F.3d at 632).   The government's argument is therefore unavailing.[3]

The second argument is no more persuasive, because even though Officer Dabney did not use his cruiser's take-down light, he did use his flashers, see Dabney's BWC at T 04:21:29Z. Delaney noted that the use of the officers' take-down light is a signal that "comes close to communicating some type of command."   Delaney, 955 F.3d at 1083 (quoting United States v. Tanguay, 918 F.3d 1, 7 (1st Cir. 2019)).   Other D.C. Circuit decisions have held that the use of sirens or flashers communicates that same "command."   See Goddard, 491 F.3d at 461 (noting that police using a siren or flashers contributes to a show of authority); see also United States v. Gross, 784 F.3d 784, 788 (D.C. Cir. 2015) (listing the use of a police cruiser's "siren or flashers" as a circumstance suggesting a seizure had occurred).

Several other factors, not considered in Delaney, further suggest that a show of authority occurred here.  First, Officers Dabney and Kelly were in full uniform.  See Castle, 825 F.3d at 633 ("[W]e are satisfied that [the defendant] was subject to the requisite show of authority when [the officer], wearing a vest labeled "Police," ran up to him in a dark, narrow alley . . . .").  Second, Officer Dabney ordered Carter and his companions to stop in authoritative language.  See United States v Jones, 142 F. Supp. 3d 49, 54, 59 (D.D.C. 2015) (concluding there was a seizure where Gun Recovery Unit officers exited their vehicle and attempted to keep the defendant from departing by stating, "I need to talk to you for a second, you need to stop").  Finally, both officers got out of their police vehicle.  Cf. id. at 58 (concluding that the fact that the "officers . . . remained in their vehicle and spoke to [the defendant] from the street and while inside the vehicle" suggested

---

[3] The government's argument that the instant case is more akin to Goddard, where officers parked their cruiser "fifteen to twenty feet away from [a] group of men" standing freely in a parking lot, is not persuasive.  See Goddard, 491 F.3d at 461.  Here, Officers Dabney and Kelly were standing at quite close quarters to Carter, not fifteen to twenty feet away.  See Dabney's BWC at T 04:21:35Z.

no show of authority).  The only factors cutting against a show of authority are that the officers'

weapons were not visible, cf. id., and that the officers did not run aggressively toward defendant,

cf. Goddard, 491 F.3d at 461.  But these two factors are outweighed by the overwhelming majority

of factors suggesting a show of authority.  Indeed, the government seems to have conceded as

much at the hearing on June 26, 2020.  See Tr. at 58:19–23 ("I don't think it's the Government's

position that this is not a Terry stop even from the moment that the officers get out of the car."

(emphasis added)).

Moreover, Carter submitted to this show of authority when he stopped between the two

officers.  See Delaney, 955 F.3d at 1084–85; see also Wood, 981 F.2d at 540 (finding submission

where defendant "did not flee from the police officers").  Although Carter did eventually flee from

the police, subsequent acts of noncompliance "do not negate" previous compliance for the

purposes of the submission requirement.  Brodie, 742 F.3d at 1061.  As a result, the initial

interaction between Carter and the officers amounted to a seizure.

### ii.  Reasonable Suspicion

The question for the Court, then, is whether, at the time of the seizure, the officers

possessed "specific and articulable facts" to "support a reasonable and articulable suspicion that

[Carter] was engaged in criminal activity."  Castle, 825 F.3d at 634.  The government argues that

the gunshots identified in the area just a minute before via the ShotSpotter system, combined with

the fact that the neighborhood was a high-crime area, provided reasonable suspicion that criminal

activity was afoot.  See Terry, 392 U.S. at 30; Gov't's Opp'n at 8.  For his part, Carter argues that

the officers had no individualized suspicion that he had done anything wrong.  Reply to Gov't's

Opp'n to Def.'s Mot. to Suppress Physical Evidence ("Def.'s Reply") [ECF No. 28] at 6.  Once

again, the Court agrees with Carter.

Delaney is instructive here as well.  The officers in that case were also investigating shots fired in a general area, primarily relying on that fact as the basis for reasonable suspicion.  Delaney, 955 F.3d at 1085.  But the court concluded in Delaney that while hearing gunshots in the area may indicate that "criminal activity was afoot broadly," without more, it does not raise any individualized "suspicion that the particular individual being stopped . . . was engaged in wrongdoing."  Id. at 1087 (internal quotation marks and brackets omitted).  More precisely, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  Id. at 1086 (quoting Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).

The government nonetheless argues that the officers did have individualized suspicion here, because ShotSpotter identified a relatively small area as the location of the gunshots, and Carter and his companions were the only people the officers saw in that area.  Tr. at 63:14–19.  The Court is not persuaded.  Even if it is true that the officers did not see anyone else walking away from the area, that does not establish that there were no other such individuals. The officers were sitting in their cruiser at an intersection to the northwest of 4905 Nash Street.  Id. at 63:4–8.  From their vantage point, the officers could view any individuals who walked north or west from 4905 Nash Street.  Id. at 63:20–64:2.   But, as the government conceded at oral argument, there were other directions someone firing the gun could have walked—east, and possibly south—as to which the officers had no visibility, because buildings or other items blocked their view.  See Tr. at 64:3–5 ("Yes. . . . [I]t is possible that someone else could have exited from an area that the officers would not have been able to see."); Dabney's BWC at T 04:21:35–04:21:44Z; see also Tr. at 17:11–14 (statement by Officer Dabney that there was no one else in the area of 4905 Nash Street NE "that we were able to see").

Moreover, even if there were no other individuals in the area, that does not necessarily establish sufficient individualized suspicion as to Carter.  Just as in Delaney, the "officers were patrolling a populated residential area . . . on New Year's Eve, a time when one would have expected other folks to be out and about celebrating.  Nothing differentiated [the defendant] from any other individual that the officers might have encountered nearby, except that the officers saw him first."  Delaney, 955 F.3d at 1086.  Attaching individualized suspicion to every person out and about in a residential area—or even to the first person sighted—merely because there were shots reported nearby, would incriminate "a very large category of presumably innocent people and, accordingly, cannot justify a seizure."  Id. at 1087 (internal quotation marks omitted).

The government's attempt to analogize this case to United States v. Brown, 334 F.3d 1161 (D.C. Cir. 2003), is also unpersuasive.  It is true that, as in Brown, the officers here had somewhat more than a generalized area where the gunshots may have occurred: the ShotSpotter alert indicated that the shots occurred in the vicinity of 4905 Nash Street NE.  Tr. at 17:22–18:12; cf. Brown, 334 F.3d at 1162.  But Brown had a number of facts, absent here, that render the case distinguishable.  First, the officers in Brown were responding to a 911 call with many specific details.  The caller, the resident of an apartment building, reported that there had been a fight in a adjacent parking lot, that shots had been fired, and that one of the shots had shattered her child's window.  Brown, 334 F.3d at 1162.  When officers arrived on the scene, there were only two cars in the parking lot.  Id.  The court stated that the specificity of the report—"that gunshots had been fired from the lot into the window of a child's bedroom"—"enhanced the probability that criminal activity had been committed, or was being committed, by someone inside one of the only two occupied cars in the lot" and thus justified a Terry stop.  Id. at 1165.  In contrast, here, police had less specificity about where the shots took place—they had only a radius of unspecified size from

the ShotSpotter alert centering on 4905 Nash Street NE.  See ShotSpotter Report; Tr. at 16:5–6 ("ShotSpotter gives a radius of where the sounds of gunshots are heard.").  And there is no persuasive evidence that Carter and his companions were the only people in the area of the shots. Furthermore, in Brown, one of the occupants of defendant's car exhibited "peculiar" behavior— exiting the vehicle, watching the officers for a while, then disappearing—that was sufficient to "raise suspicion or concern."  Id. at 1167.  Here, the government has been able to point to no behavior beyond Carter and his companions simply walking in a residential neighborhood on New Year's Eve, which is certainly not out of the ordinary.  See Delaney, 955 F.3d at 1086.

Beyond the gunshots, the government also points to the fact that the incident occurred in a high-crime area at night.  Tr. at 9:22–25.  While presence in a high-crime area can be a relevant factor, it is "insufficient by itself to amount to reasonable suspicion."  United States v. Johnson, 212 F.3d 1313, 1316 (D.C. Cir. 2000) (citing Wardlow, 528 U.S. at 124).  Nor can the time of day, though relevant, establish reasonable suspicion on its own.  Jones, 142 F. Supp. 3d at 59 (citing Brown, 334 F.3d at 1165).  On their own or together, these three factors—the gunshots, the high-crime area, and the time of day—are insufficient to create individualized "suspicion that the particular individual being stopped . . . was engaged in wrongdoing."  Delaney, 955 F.3d at 1087 (internal quotation marks and brackets omitted).  "The demand for specificity in the information upon which police action is predicated . . . is the central teaching of [the Supreme Court's] jurisprudence, and specificity is precisely what is missing here."  Id. (quoting Terry, 392 U.S. at 21 n.18 (cleaned up)).  The Court therefore concludes that Officers Dabney and Kelly lacked reasonable suspicion as to Carter at the time of the initial interaction, when the officers stopped Carter and his companions on the street.

**B. Officers order Carter against a fence**

Even if the Court did not conclude that the officers had seized Carter without reasonable suspicion at the time of the initial interaction, the result would be no different if the Court analyzed the encounter about a minute later, after Officers Dabney and Kelly had surrounded Carter and his companions, explained to the three men that there had been shots in the area they were walking away from, "right there on Nash," and told them to "lean up against the fence" because the officers had to search them.  Dabney's BWC at T 04:22:00Z.  That subsequent "stage" of the encounter also amounted to a Fourth Amendment seizure conducted without reasonable suspicion.

As to whether a seizure had occurred, all the same factors as above were present, with several additional facts.  By this point, Officer Dabney had ordered Carter to stop and "lean up against the fence," further restricting his movement.  Id.  Forcing a suspect to lean against a physical object, like a fence or a car, is a show of authority.  See Brodie, 742 F.3d at 1061 (stating that "the police made a show of authority when they ordered [defendant] to put his hands on the car," thus restraining his movement); see also United States v. Hood, 2020 WL 353859, at *4–5 (D.D.C. Jan. 21, 2020) (concluding there was a show of authority where the police told defendant to "hold on a sec," which implied "that he could not walk away," and subsequently told him to "stop backing away" and to stand in front of their police car).  Carter complied with this show of authority by standing against the fence, constituting a submission.  Hodari D., 499 U.S. at 626.  Because there was both a show of authority and submission to that authority, a Fourth Amendment seizure occurred.

With respect to the individualized suspicion requirement, the government contends that by this point in the encounter, an additional fact contributed to the officers' reasonable suspicion, beyond those already discussed: the fact that Carter had made a "furtive gesture"—having "his

14

right arm . . . pinned to his side"—which Officer Dabney associated with having a gun.  Tr. at 67:3–12.  Courts have generally considered a defendant's furtive gestures in direct response to police presence to be a powerful factor in favor of finding reasonable suspicion.  See Jones, 142 F. Supp. 3d at 60 (concluding, based on "the high-crime area, the late hour, [defendant's] evasive, nervous behavior, the furtive movements that suggested an effort to conceal contraband, and the latex glove he wore and then discarded," that the officers had reasonable suspicion); see also Johnson, 212 F.3d at 1316 (finding reasonable suspicion where, after officers drew their weapons and commanded the defendant to put his hands up, he instead "continued to make 'shoving down' motions . . . that were the very opposite of complying" with the officers' orders).

Here, however, the Court cannot conclude that Carter actually made any furtive gestures at all.  Officer Dabney's body-worn camera footage reveals that Carter was holding a white bag in his right arm.  See Dabney's BWC at T 04:21:37Z; see also Kelly's BWC at T 04:22:10Z.  The gesture that Officer Dabney identified as Carter having "his right arm . . pinned to his side" appears to be equally consistent with simply holding the bag.[4]  See Dabney's BWC at T 04:21:37Z.  And at one point, Carter actually stretched his arm out along the fence.  See id. at T 04:22:11Z.  Upon review of the footage, Carter's supposed furtive gestures were too miniscule, if they existed at all, to have created reasonable suspicion in the mind of a reasonable officer in Officer Dabney's circumstances.  See Terry, 392 U.S. at 30.

The government further points out that Carter incorrectly initially stated that it was the Fourth of July in response to Officer Dabney's questioning, before correctly volunteering it was New Year's, contending that this demonstrates that Carter was nervous (and thus suspicious).  See Dabney's BWC at T 04:22:20Z; Tr. at 27:3–16.  The Court bears in mind, however, that this

---

[4] Indeed, based on his testimony at the hearing, it appears that Officer Dabney did not recognize that Carter was holding a bag during the stop.  Tr. at 43:4–5; 44:16–20.

15

encounter occurred on a night of excitement and festivity—New Year's Eve—and Carter's response may have merely been an innocent mistake made during an unwanted encounter with the police.  "[N]ervousness alone, does not suffice to establish reasonable suspicion."  Jones, 142 F. Supp. 3d at 60.  Without the additional justification of furtive gestures, therefore, the only fact the government can point to—beyond the reported gunshots in a high-crime area late at night—as establishing reasonable suspicion is a lone erroneous statement.  That does not add much, if anything, to the analysis, and the Court concludes that the officers lacked reasonable suspicion to stop Carter at this stage of the encounter as well.

## Conclusion

For these reasons, the Court concludes that Officers Dabney and Kelly seized Carter without reasonable suspicion.  While there was, as in Delaney, evidence that "criminal activity may be afoot" broadly, Terry, 392 U.S. at 30, there was insufficient suspicion that Carter was "engaged in wrongdoing," United States v. Cortez, 449 U.S. 411, 418 (1992).  See Delaney, 955 F.3d at 1087.  The government failed to produce sufficient specificity in the information relied on for the police action, and hence did not carry its "burden of establishing 'a reasonable and articulable suspicion that [Carter] was engaged in criminal activity.'" Id. (quoting Castle, 825 F.3d at 634).  This was therefore a Fourth Amendment violation, the fruits of which must be suppressed.  Accordingly, Carter's [24] motion to suppress physical evidence will be granted.  A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 10, 2020